# In the United States Court of Federal Claims

No. 08-610C
(Filed: November 6, 2012)

|  |  |  |
|---|---|---|
| TEXTAINER EQUIPMENT MANAGEMENT LIMITED, et al., | ) ) ) ) | **Fifth Amendment Taking; Sovereign Versus Proprietary Capacity; Real Party in Interest under RCFC 17;** |
| Plaintiffs, | ) | **"Buyer in the Ordinary Course" and** |
| v. | ) | **"Entrustment" Under the Uniform** |
| | ) | **Commercial Code** |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

*Lars H. Liebeler*, Washington, DC, for plaintiffs.

*Robert C. Bigler*, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Brian M. Simkin*, Assistant Director, for defendant.

## OPINION

**FIRESTONE**, *Judge.*

Pending before the court are the parties' renewed cross-motions for summary judgment in this Fifth Amendment takings case. For the reasons discussed below, the parties' motions for summary judgment are **STAYED** in regard to plaintiff Textainer and in regard to the proper interest rate to apply in determining just compensation. Plaintiffs' motion for summary judgment in regard to plaintiffs CAI and Cronos is **DENIED**, and

-1-

the defendant the United States' ("the government") cross-motion for summary judgment in regard to plaintiffs CAI and Cronos is **GRANTED.**

## I.    BACKGROUND

Many of the undisputed facts in this case are outlined in this court's first summary judgment opinion, Textainer Equipment Management Ltd. v. United States, 99 Fed. Cl. 211 (2011).  In brief, plaintiffs CAI International, Inc. ("CAI"), Cronos Containers Limited ("Cronos"), and Textainer Equipment Management (U.S.) Limited ("Textainer") (a company that manages shipping containers originally owned by Capital Lease Limited ("Capital")) each own and/or manage a large fleet of intermodal shipping containers that were leased to a third party company, TOPtainer.  TOPtainer, in turn, leased plaintiffs' containers to the Army pursuant to a Master Lease agreement ("Master Lease") between TOPtainer and the United States.  Plaintiffs were not parties to the Master Lease.  The containers were sent to Iraq and Afghanistan for military use.

Under the terms of the Master Lease, the government took title to any containers that were "lost" or "deemed lost" ninety days after the end of the lease term.  Pls.' First Mot. for Summ. J. ("Pls.' First Mot."), Ex. 9, ECF No. 27.  The Master Lease provided that the government would pay TOPtainer for the containers that were either lost or deemed lost.  Id.  Plaintiffs' leases with TOPtainer had provisions that authorized TOPtainer to pay plaintiffs for containers that were "lost."  Id., Exs. 5, 6, 8.  Plaintiffs in their contracts with TOPtainer expressly prohibited TOPtainer from selling their containers or transferring title to the containers without their consent.  At the end of the Master Lease term, the government paid TOPtainer for approximately 1000 containers

-2-

that the government claimed it could not find after the lease expired. Although the government paid TOPtainer for these allegedly "lost" or "deemed lost" containers, TOPtainer did not pay or only partially paid plaintiffs for the "lost" containers. TOPtainer is no longer in existence.

Plaintiffs filed their original complaint in this court on September 2, 2008, alleging that the government had taken title to their property—their containers—without paying just compensation in violation of the Fifth Amendment of the Constitution of the United States. On June 17, 2011, the court issued an opinion denying plaintiffs' motion for summary judgment on liability, and granting in part and denying in part plaintiffs' motion for summary judgment on damages. The court found that "[t]he government has not taken property where it acts in its proprietary capacity pursuant to a contract right." Textainer, 99 Fed. Cl. at 218 (citing Janicki Logging Co. v. United States, 36 Fed. Cl. 338, 346 (1996)). Rather, "to effect a taking, the government must act pursuant to its sovereign powers or invoke sovereign protections." Textainer, 99 Fed. Cl. at 218 (citation omitted). Based on these principles, the court held that to the extent the government was acting in its proprietary capacity when it took title to and paid TOPtainer for plaintiffs' containers, plaintiffs' sole remedy would be against TOPtainer for breach of contract. Id.

However, based on the Supreme Court's holding in Armstrong v. United States, 364 U.S. 40, 48-49 (1960), the court went on to hold that if the government was shown to have acted outside of its proprietary capacity, and in its sovereign capacity, a taking may have occurred. Plaintiffs had presented some evidence to show that various containers

were not "lost" but that the government had instead simply decided to keep them for military use. If the government decided to "take title" to the containers outside the scope of the contract, the court held, a sovereign act may have occurred. Based on the evidence presented by plaintiffs, the court held that disputed issues of fact precluded the entry of summary judgment. Id. at 220-21.

Finally, in addressing the issue of just compensation, the court agreed with the parties' stipulation that if a taking were established the measure of compensation would be calculated using the depreciated replacement value of the containers established in clause H-6 of the government's Master Lease with TOPtainer. Id. at 221. With regard to the measure of the pre-judgment interest rate, also briefed on summary judgment, the court held that, absent "special proof," it would apply the Declaration of Taking Act interest rate, based on the weekly average one-year constant maturity Treasury yield, id. at 221-23 (quoting the Declaration of Taking Act, 40 U.S.C. § 3116 (2006)), if a taking were established.

Following the court's decision, plaintiffs moved to amend their complaint to add third party beneficiary and breach of contract claims. On January 10, 2012, the court denied plaintiffs' motion for leave to amend their complaint to add contract causes of action. Opinion, ECF No. 81. A trial date was then set for March 13, 2012 regarding plaintiffs' takings claims. At the pre-trial conference on March 2, 2012, the parties requested permission to file renewed cross-motions for summary judgment. Specifically, plaintiffs presented undisputed evidence to the court to show that 125 containers that had been owned by Capital and were now the subject of plaintiff Textainer's claim were

never "lost," but were instead sent to Okinawa, Japan and thus appeared to have been "taken" outside the terms of the Master Lease. See Pls.' Renewed Mot. ("Pls.' Mot.") at 1, ECF No. 91. In addition, undisputed evidence showed that Capital had notified the government's legal counsel, before the government took title or authorized any payments for any of the allegedly "lost" containers, that TOPtainer was in default of its contract with Capital and that TOPtainer no longer had any rights to lease the subject containers. Id. at 2; id., Ex. E. Capital asked that all containers in the government's possession belonging to Capital be returned to Capital. Id., Ex. E.

The court agreed to postpone the trial and accept renewed motions. On March 16, 2012, plaintiffs filed their pending renewed motion for summary judgment arguing, based on the above-cited facts, that the government effected a taking when it took "title" to plaintiffs' containers after receiving notice that TOPtainer was in default of its contracts with plaintiffs and when the government kept many containers it knew were never lost.[1] Plaintiffs contend that the government violated their Fifth Amendment rights by failing to pay them just compensation for their containers.

The government has filed its cross-motion for summary judgment arguing that irrespective of these undisputed facts, the government took lawful title to the subject containers because it was simply acting under its contract with TOPtainer as "a buyer in

_____

[1] Plaintiffs also sought sanctions against the government for failing to timely reveal that the containers sent to Okinawa, Japan were never lost. See Pls.' Mot. for Sanctions, ECF No. 94.

the ordinary course" under the Uniform Commercial Code ("UCC").[2] According to the government, it was acting in its proprietary capacity when it took title to the containers and thus there has not been a taking within the meaning of the Fifth Amendment. The government also argues that plaintiffs Textainer and Cronos do not have standing to bring a takings claim because they are seeking compensation for containers they never owned.

The primary question before the court in these cross-motions is whether the government took title to some or all of the subject containers after it learned that TOPtainer no longer had any legal rights to the containers. If the answer to this question is "yes" with respect to some or all of the containers, then the government may not be "a buyer in the ordinary course" and may have taken title to some or all of plaintiffs' property in its sovereign capacity. If so, the government would be liable under the Fifth Amendment and would be required to pay just compensation.

However, before turning to this question, the court must first address whether, as the government charges, certain plaintiffs lack standing to assert a takings claim. The government argues in its cross-motion for summary judgment that Textainer never owned any of the containers for which it is seeking compensation, and therefore the court must dismiss its entire takings claim for lack of standing.[3] The government also argues that

_____

[2] As discussed in detail infra, the UCC defines a "buyer in the ordinary course" as "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind." UCC § 1-201(9).

[3] It is not disputed that each plaintiff must have a cognizable property interest to have standing. See Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004) ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court[']s task is at an end.").

plaintiff Cronos never owned several of the containers for which it is seeking compensation and thus it lacks standing for certain claims. Further, the government argues that, to the extent Textainer and Cronos are making claims as successors to the original owners of the containers, their claims for just compensation are barred by the Anti-Assignment Act.[4]

Textainer does not dispute that it never owned the containers for which it seeks compensation. Instead, Textainer claims that it brought this suit on behalf of Capital's successor in interest, Green Eagle Investments ("Green Eagle"). Textainer now moves to join Green Eagle as the "real party in interest" under Rule 17 of the Rules of the United States Court of Federal Claims ("RCFC"). In plaintiffs' motion to ratify, join, or substitute Green Eagle as the real party in interest, plaintiffs argue that Textainer's actions in bringing this suit have been ratified by Green Eagle, and, alternatively, that joinder of Green Eagle as the real party in interest is appropriate in this case. See Pls.' Mot. for Joinder at 3-6, ECF No. 125. The government opposes plaintiffs' motion to ratify or join Green Eagle as the real party in interest. The government contends that Green Eagle has not established that it is the real party in interest because there is evidence to suggest that Capital is still in existence and remains the rightful owner of any

_____

[4] It is also not disputed that if the Anti-Assignment Act bars a claim the action must be dismissed. See Ins. Co. of the W. v. United States, 100 Fed. Cl. 58, 62 (2011) (citing Ins. Co. of the W. v. United States, 243 F.3d 1367, 1375 (Fed. Cir. 2001)) (stating that "when either of the Anti-Assignment Acts renders an assignment ineffective against the United States, the waiver of sovereign immunity found in the Tucker Act is withdrawn . . . [a]nd without that waiver of sovereign immunity, no jurisdiction would exist to adjudicate the claim").

takings claim. See Def.'s Resp. to Pls.' Mot. for Joinder at 2-3, ECF No. 126. The government also argues that it would be prejudiced by joining Green Eagle at this stage of the litigation. Id. at 6-8.

The court now turns to the parties' arguments. The opinion will address the above-identified issues for plaintiffs Textainer, CAI, and Cronos in order. The relevant disputed and undisputed facts for each issue will be addressed separately for each plaintiff.

## II.    DISCUSSION

### A.    Green Eagle may be joined in this lawsuit as the real party in interest, but further discovery is needed to determine whether Green Eagle has standing to pursue a takings claim.

#### 1.    Factual background.

Although, as noted above, this case was filed by Textainer Equipment Management (U.S.) Limited, it is now undisputed that Textainer does not own the 477 containers for which it is seeking compensation. Textainer has presented evidence to show that Capital, the original owner of the 477 containers, was sold through a stock purchase agreement ("the SPA") to Green Eagle Investments on July 23, 2007. Pls.' Reply, Tab 2, Ex. 1 (the SPA). Textainer contends that under the SPA, Green Eagle became the successor to Capital and acquired Capital's claim in this litigation. Textainer also presented evidence to show that after Green Eagle acquired Capital, Green Eagle made Textainer the manager of all the containers acquired from Capital in a separate, contemporaneous agreement. Pls.' Reply, Tab 2, Ex. 2 (the management agreements). Green Eagle has ratified Textainer's actions in this case. Pls.' Reply, Tab 2 ¶¶ 8-9.

The SPA between Capital and Green Eagle states that Green Eagle paid $185 million for one hundred percent of the stock in Capital Lease Limited and its subsidiaries. Pls.' Reply Tab 2, Ex. 1, at 12 ("The Seller hereby sells to the Purchaser . . . the Shares with economic effect as of 31 December 2006 . . . . The consideration for the Shares to be paid by the Purchaser shall amount to USD 185,000,000.00 . . . ."). According to the affidavit of Willem de Bruijn, Managing Director of Green Eagle, Capital Lease Limited and all of its subsidiaries ceased operations when Green Eagle purchased Capital under the SPA. Id., Tab 2 ("On July 23, 2007, Green Eagle purchased all the assets and operations of Capital Lease Limited . . . . Capital Lease Limited and all its subsidiaries ceased operation at this time."). The affidavit further states that Textainer, as the manager of the containers acquired from Capital, has been authorized to bring this case on behalf of Green Eagle. Id.

The government contends that disputed issues of fact preclude the court from ruling that Green Eagle is the real party in interest. The government has presented evidence suggesting that Green Eagle did not acquire the whole of Capital (both liabilities and assets) but instead only acquired Capital's assets. If true, the government argues, Capital may still exist and may have its own claim regarding a taking of the 477 containers. Specifically, the government relies on a press release accompanying the SPA to argue that Capital may still exist as a separate entity. The press release states: "In a transaction that closed on 23 July 2007, CIF 3, an investment fund advised by DVB Bank, acquired Capital Lease Limited, Hong Kong, the world's 8th largest container leasing company, and simultaneously sold the management rights to Capital Lease's over

-9-

0.6 million TEU container fleet to Textainer." Def.'s Cross-Mot. at 17 n.5 (citing Press

Release, DVB Bank, DVB Fund and Textainer Team Up to Buy Capital Lease (July 24,

2007),

http://www.dvbbank.com/en/press/press_releases/archive/repository/2007/24_07_2007.ht

ml.). The government argues that it follows from this press release that Capital may still

exist. The government contends that this conclusion "is consistent with DVB Bank's

2011 Annual Report, which discloses that DVB may own or control a list of companies

including Green Eagle and Capital and providing the net income of Capital for 2011."

Def.'s Reply at 7 n.4 (citing DVB Bank, Annual Report 2011 at 204,

http://www.dvbbank.com/en/investor_relations/publications/archive/2011/dvb_group_ar_

2011.pdf). The government also argues that it is not clear from the SPA that, even if

Capital no longer exists, Capital's takings claim was ever transferred to Green Eagle,

because the SPA references the takings claim with the United States as "closed." Id. at 7;

Pls.' Reply, Tab 2, Ex.1.

### 2. Green Eagle may be joined as the real party in interest.

The court finds that under the standards established under RCFC 17, Green Eagle

may be joined as the real party in interest. The "real party in interest is one who has a

real, actual, material or substantial interest in the subject matter of the action." Haddon

Hous. Assocs., LLC v. United States, 92 Fed. Cl. 8, 15 (2010) (quotation omitted).

RCFC 17(a)(3) provides: "The court may not dismiss an action for failure to prosecute in

the name of the real party in interest until, after an objection, a reasonable time has been

allowed for the real party in interest to ratify, join, or be substituted into the action. After

-10-

ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." Importantly, whether a party should be joined as a real party in interest is a procedural question that does not answer all questions about whether the court has jurisdiction over that party. Sys. Fuels, Inc. v. United States, 65 Fed. Cl. 163, 171 (2005).

Here, the court finds based on the language of the SPA and the affidavit of Mr. de Bruijn that Green Eagle has sufficiently alleged a "real, actual, material, or substantial interest" in this action, and therefore may be joined as the real party in interest. Haddon, 92 Fed. Cl. at 15. It is well-settled that "courts should be lenient in permitting ratification, joinder, or substitution" of the real party in interest. First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999). In addition, allowing Green Eagle to join this action will effectuate the purpose of RCFC 17, which is to "protect defendants from multiple liability in actions by subsequent claimants and also to ensure that the judgment in the action will have res judicata effect." Sys. Fuels, 65 Fed. Cl. at 170 (citing 4 Daniel R. Coquillette et al., Moore's Federal Practice § 17.10 (3d ed. 2004) (discussing the analogous federal rule)). Certainly, as between Textainer and Green Eagle, Green Eagle is the real party in interest.

The court further finds that joining Green Eagle will not unduly prejudice the government. This case has not been re-set for trial and the court will ensure that the government is given ample time to conduct discovery into the relationship between Green

Eagle and Capital before resolving the case.[5]  In this unique case, the court finds that it is appropriate to join Green Eagle as the real party in interest and allow further discovery into the nature of Green Eagle's takings claim.  By joining Green Eagle, the court does not rule on whether Green Eagle has standing to bring this takings claim.  Sys. Fuels, 65 Fed. Cl. at 171.  Rather, the court will stay consideration of the government's motion for summary judgment based on lack of standing, and the government's motion for summary judgment under the Anti-Assignment Act, until discovery into Green Eagle's relationship with Capital is closed.  If the government determines that Green Eagle is not Capital's successor, or that Green Eagle's claim for the 477 containers is barred under the Anti-Assignment Act, it may renew or ask for a ruling on its motion for summary judgment pursuant to the schedule set forth at the conclusion of this opinion.[6]

---

[5] In this connection, the court notes that the government has had ample time to take discovery into the relationship between Capital and Textainer and the relationship of Capital with TOPtainer.  The government has also had ample time to take discovery into Capital's interactions with the government prior to 2007 and the sale of its stock to Green Eagle Investments.  Textainer put the government on notice from the outset of this litigation that it was pursuing this takings claim as a successor to Capital.  As discussed supra, it is not disputed that Capital owned the 477 containers at issue and that Capital took steps to protect its interest in the 477 containers prior to the government taking "title" to its containers under the Master Lease with TOPtainer.  There is also no dispute that 125 of these containers were never lost or deemed lost under the TOPtainer Master Lease, but were instead transferred to Japan for use by the government without compensating Capital.

[6] The court will also stay consideration of plaintiffs' motion for sanctions based on the newly discovered evidence that 125 of Capital's containers were never "lost."  The court will not rule on this motion before Green Eagle establishes standing to pursue Capital's takings claim.

**B. The government is entitled to summary judgment as to plaintiff CAI.[7]**

Plaintiff CAI claims compensation for 387 containers leased by TOPtainer that were not returned at the conclusion of the government's Master Lease with TOPtainer. The government does not dispute, for the purposes of these renewed cross-motions, that CAI owned all 387 containers for which it seeks compensation, and does not challenge CAI's standing to pursue its claim.[8]  The court will therefore proceed to the merits of CAI's takings claim.

---

[7] The standard of review for cross-motions on summary judgment is well settled.  Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986).  The moving party carries the burden of establishing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A "genuine" dispute is one that "may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.  A material fact is one that "might affect the outcome of the suit under the governing law."  Id. at 248.  In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).   If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary judgment may be granted.  Id.  With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered.  Marriot Intern. Resorts, L.P. v. United States, 586 F.3d 962, 968-69 (2009).

Summary judgment is also appropriate where the only issues to be decided are issues of law. Huskey v. Trujillo, 302 F.3d 1307, 1310 (Fed. Cir. 2002) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999)); 10A Charles Alan Wright et al., Federal Practice & Procedure § 2725 (3d ed. 2012) ("It necessarily follows from the standard set forth in the rule that when the only issues to be decided in the case are issues of law, summary judgment may be granted.").

[8] CAI also managed 48 containers owned by Interpool, CAI's corporate parent company, at the time of the alleged taking.  CAI received payments from TOPtainer that covered the containers it owned as well as containers owned by Interpool.  CAI has credited $204,854.18 of those payments toward all of the Interpool containers and some of the 435 CAI containers subject to the buyout.  As such, it is seeking $359,952.94 for only 387 containers owned by CAI.  Pls.' Reply at 8.

-13-

### 1. Factual background.

The following facts are undisputed. Under Clause H-7 of the Master Lease, the government had contracted for the right to take title to any of the containers the government had leased from TOPtainer if the government could not return the containers to TOPtainer ninety days after the Master Lease expired. Clause H-7 of the Master Lease provides:

> The Government shall have a period of ninety (90) days, from the date of expiration of the lease period, to continue leasing containers at the same per diem rate as the expired lease period. Containers or chassis not redelivered by the completion of the contract period and not returned to the contractor within the ninety (90) day redelivery period, may be deemed lost. At the time a unit(s) is determined lost or deemed lost by operation of this clause, title of the unit(s) will transfer from the contractor to the government. The contractor will be provided reimbursement for all "lost" units upon proper invoice, at the depreciated reimbursement price. The contractor shall notify the Government upon completion of the . . . lease period that the ninety (90) day redelivery period has commenced.

Pls.' First Mot., Ex. 9.

The Master Lease between TOPtainer and the government expired on July 1, 2004. It is not disputed that the government received notice prior to the end of the ninety day period that TOPtainer was in default with Capital. The undisputed evidence established that Capital notified the government in August 2004 that TOPtainer had defaulted on its lease with Capital and that Capital had terminated that lease. Specifically, on August 4, 2004, Capital contacted one of the government's contracting representatives and explained that TOPtainer no longer had any right to possess or sell Capital's containers. Capital followed up this notice with a letter from its attorney to Greg Ircink, an attorney responsible for work on the Master Lease at the government's

-14-

Surface Deployment and Distribution Command ("SDDC"). In the letter, Capital's attorney reiterated that Capital had placed TOPtainer in default in July 2004 and that Capital was seeking the return of its containers from the government. Pls.' Mot., Ex. E ("Toptainer has been selling Capital Lease's equipment without our client's consent. . . . We request that SDDC turn the equipment over to Capital Lease. Alternatively, we request that SDDC retain the equipment until an order can be obtained from the appropriate Court."). On August 13, 2004, Mr. Ircink responded to Capital's counsel stating that "the contracting officer feels that it is insufficient evidence with which it can be concluded that our contractor, TOPtainer, is in default of the contract between itself and your client." Pls.' Mot., Ex F. Thereafter, the government decided to pay TOPtainer for the containers that had been subleased from Capital.

The undisputed evidence also established that CAI provided notice to the government of CAI's rights to its containers that were leased to TOPtainer in February 2005. Specifically, on February 8, 2005, more than four months after the ninety day period under the Master Lease had expired, CAI informed the government that TOPtainer did not have the right to sell any of CAI's containers. Pls.' First Mot., Ex. 18 ("[T]hese units are CAI's asset and Toptainer has no right to sell these containers."). The government responded to CAI that same day stating that the government had already declared CAI's containers lost and was in the process of paying TOPtainer for the lost containers, in accordance with Clause H-7 of the Master Lease. The government went on to explain that the government would not stop paying TOPtainer for CAI's containers

without a court order.[9]  Id. ("Since our contract with Toptainer requires that we purchase the units if we are unable to redeliver[] within 90 days of expiration date of lease we cannot stop this action unless you have a legal stop order.").

The buyout of CAI's containers continued in accordance with the following timeline.  TOPtainer invoiced the government for the lost or deemed lost CAI containers on December 29, 2004.  No later than January 14, 2005, the government stopped paying its per diem rates to TOPtainer for CAI's containers.  On February 4, 2005, Contracting Officer Greg Dawson, the contracting officer who oversaw the administration of the Master Lease at the SDDC, signed a contract modification, executing a buyout of certain containers under the Master Lease, including 8 of CAI's containers.  Four days later, on February 8, 2005, CAI informed the government that TOPtainer had no right to sell CAI's containers.  The government responded that the containers had already been declared lost, that the government was in the process of paying TOPtainer for the lost containers, and that the United States would not stop paying TOPtainer without a court order.  On February 17, 2005, Contracting Officer Dawson signed another contract modification, authorizing the purchase of 427 CAI containers.  Payment occurred separately for the two separate contract modifications.  On March 21, 2005, the government paid TOPtainer for the 427 containers subject to the February 17, 2005

---

[9] CAI is only pursuing a takings claim for 387 containers out of 435 CAI containers subject to the TOPtainer buyout.  CAI concedes that it received payment from TOPtainer for a number of its containers.  See supra note 8.

-16-

contract modification. On May 13, 2005, the government paid TOPtainer for 8 CAI containers subject to the February 4, 2005 contract modification.

## 2. Discussion.

Based on the above-stated undisputed facts, the government argues that it took valid title to CAI's containers under the terms of its Master Lease as a "buyer in ordinary course" and that CAI has therefore failed to establish a "taking" of those containers. Specifically, the government argues that it qualifies as a "buyer in the ordinary course" under the Uniform Commercial Code ("UCC") because it purchased plaintiffs' containers in good faith and without knowledge of TOPtainer's default, acting under the terms of the Master Lease. As such, the government contends, it took valid title from TOPtainer under UCC §§ 2-403 and 2A-305(2), which recognize the "entrustment" doctrine. See 1 White, Summers, & Hillman, Uniform Commercial Code § 4:34 (6th ed. 2010).

Under UCC § 2-403(2), a "buyer in the ordinary course" may take good title from a "merchant," even for goods that the merchant does not own but were entrusted to that merchant. UCC § 2A-305(2) extends this concept from sales to leases, as is the case here. Based on these provisions, the government argues that TOPtainer qualified as a "merchant" under the UCC, and that, as a "buyer in the ordinary course," it took valid title to plaintiffs' containers.[10] In such circumstances, the government contends, the

_____

[10] Plaintiffs argue that TOPtainer was not a "merchant" under the UCC. The UCC defines a "merchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." UCC § 2-104(1). Given the UCC's "expansive" definition of merchant, DeWeldon, Ltd. v. McKean, 125 F.3d 24, 27 (1st Cir. 1997), the court agrees with the government that TOPtainer is a "merchant" under the UCC because TOPtainer was a business

-17-

government took title to CAI's containers acting in its proprietary, not its sovereign, capacity.

Plaintiffs argue that the government was not a "buyer in the ordinary course" because it was on notice that TOPtainer did not have the right to sell CAI's containers. Plaintiffs contend that the government's decision to retain title to CAI's containers without paying CAI after the government learned of TOPtainer's default was a sovereign act, outside the terms of the Master Lease and the protective scope of the UCC's "buyer in the ordinary course" and "entrustment" provisions.

> ### a.  Under Armstrong v. United States, the government can effect a taking in a contractual context when its status as a sovereign allows it to obtain property rights it otherwise could not obtain as a private party.

As this court has previously held, the government has not taken property where it acts in its proprietary capacity, pursuant to a contract right. Textainer Equip. Mgmt. Ltd. v. United States, 99 Fed. Cl. 211, 218 (2011). Rather, where the government acts pursuant to its contracting authority, a Fifth Amendment taking may only arise if some intervening sovereign act is identified. Id. (citing Armstrong v. United States, 364 U.S. 40, 48-49 (1960)). In Armstrong v. United States, the Supreme Court held that the government was liable for a taking where its sovereign status rendered it immune from suit by third parties holding liens on property that passed to the government by virtue of the terms of a contract. The Court explained that a taking had occurred "because the

---

involved in leasing and managing containers. Plaintiffs argue in the alternative that even if TOPtainer was a merchant, the government could not take valid title once it knew that TOPtainer no longer had any rights to CAI's containers.

-18-

Government for its own advantage destroyed the value of the liens, something that the Government could do because its property was not subject to suit, but which no private purchaser could have done." Id. at 48. Because the government's status as the sovereign rendered it immune from suit, the government was liable for just compensation under the Fifth Amendment, even where the government's receipt of the property at issue occurred in a contractual context. Id. at 48-49.

Here, the court is also presented with a potential taking in a contractual context. If, as plaintiffs allege, if the government knew that plaintiffs had revoked TOPtainer's authority over their containers but decided to take title to them anyway, the government "took" plaintiffs' property outside of the rights provided for in the Master Lease and had to have obtained title to the containers in its sovereign capacity. Under Armstrong, such an action amounts to a Fifth Amendment taking. Id. at 48 ("[T]he use of a contract to take title [does not] relieve[] the Government from its constitutional obligation to pay just compensation for the value of the liens the petitioners lost and of which loss the Government was the direct, positive beneficiary.").

### b. The government cannot be liable for a taking unless it had notice of TOPtainer's default before the date that title transferred.

A determination of whether the government acted in its sovereign rather than its proprietary capacity when it took title to CAI's containers—and therefore whether a taking occurred—depends on whether the government knew that TOPtainer lost its rights over CAI's containers when the government took title to CAI's containers. The government cannot be liable for a taking where it "had no notice of plaintiff's claim of

-19-

title." J.J. Henry Co. v. United States, 411 F.2d 1246, 1250 (Ct. Cl. 1969). "In the absence of some indication . . . through some communication to the government that [plaintiff] retained rights in the [property it alleged has been taken], . . . the government has not taken plaintiff's property within the meaning of the Fifth Amendment." Id. In this case, the timing of the notice is crucial, because if the government did not have notice that TOPtainer did not have the right to transfer title, the government was acting in its proprietary, not sovereign, capacity when title transferred under the Master Lease. On the other hand, if the government did have notice of TOPtainer's default in advance of taking title, and knew that TOPtainer had lost its rights over the containers, the government was acting outside of its rights under the Master Lease when it took title to plaintiffs' containers, and a taking has occurred.

In resolving this question, the court agrees with the government that the provisions of the UCC are instructive. See Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001) ("[T]he Uniform Commercial Code provides useful guidance in applying general contract principles."). Section 2-403(2) of the UCC provides that if a party entrusts goods to a merchant that deals in those types of goods, a "buyer in the ordinary course" who purchases the goods from the merchant receives the goods free of any interest of the party that originally entrusted the goods to the merchant.[11] UCC § 2A-305(2) further provides that when a lessor (in this case, CAI)

---

[11] UCC § 2-403(2) provides: "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business."

entrusts goods to a lessee (such as TOPtainer) who is a merchant that deals in those types of goods, and a "buyer in the ordinary course" (the government) purchases those goods from the merchant (TOPtainer), the buyer obtains all of the lessor's (CAI's) and the lessee's (TOPtainer's) rights, and takes free and clear of the existing lease contract.[12] Under the UCC, as long as the government was a "buyer in the ordinary course," it could purchase plaintiffs' containers free and clear of the lease between TOPtainer and plaintiffs.

The UCC defines a "buyer in the ordinary course" as "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind." UCC § 1-201(9). Under the most recent revision of the UCC, § 1-201(b)(20) defines "good faith" to "mean[] honesty in fact and the observance of reasonable commercial standards of fair dealing" for both merchants and non-merchants who are "buyers in the ordinary course." However, the states have adopted various versions of the UCC, some choosing to retain the old definition of "good faith" as "honesty in fact in the conduct or transaction concerned." Robyn L. Meadows et al., 2006 Uniform Commercial Code Survey: Introduction, 62 Bus. Law. 1555, 1555 n.3 (2007).

---

[12] UCC § 2A-305(2) provides: "A buyer in the ordinary course of business or a sublessee in the ordinary course of business from a lessee who is a merchant dealing in goods of that kind to whom the goods were entrusted by the lessor obtains, to the extent of the interest transferred, all of the lessor's and lessee's rights to the goods, and takes free of the existing lease contract."

Here, to determine whether the government was a "buyer in the ordinary course," the court must first determine the date of the potential taking—the date that the government obtained title to plaintiffs' containers. See Armstrong, 364 U.S. at 41, 45-46, 48 (finding that, under a government contract for Navy boats which provided that in the event of default by the contractor, the government could terminate the contract and require the contractor to transfer title, a taking occurred for the value of plaintiffs' liens on uncompleted boat hulls when title transferred to the government). Then, the court must determine whether the government received notice before this date such that it could not obtain good title to plaintiffs' containers as a "buyer in the ordinary course." As the government recognizes in its briefs, "unless plaintiffs notified the Government that TOPtainer was no longer validly in possession of the containers, the Government obtained good title to the containers." Def.'s Reply at 1.

The government argues that the date it took title was the date the containers were "deemed lost," which was at the latest January 14, 2005, the date when the government stopped paying the per diem rental charges for plaintiffs' containers under the terms the Master Lease. Def.'s Reply at 17 ("[T]itle had already passed to the government on January 14, 2005."). Plaintiffs argue that the date of the taking occurred, for CAI, when CAI provided notice of its right to its containers on February 8, 2005.

After a consideration of these arguments, the court holds that, similar to the contract at issue in Armstrong, the relevant date for the takings analysis is the date the containers were declared lost or deemed lost by the government because that is the date on which title transferred to the government under the express terms of the Master Lease.

-22-

See 364 U.S. at 41, 45-46, 48 (finding that the taking occurred when title passed pursuant to the government's actions under a government contract). Under the UCC, "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." UCC § 2-401(1). The government's Master Lease with TOPtainer allowed the government to declare the leased containers lost ninety days after the July 2004 expiration of the Master Lease. Pursuant to the same clause in the Master Lease, the government received title to plaintiffs' containers at the time those containers were "determined lost or deemed lost." Pls.' First Mot., Ex. 9. In exchange, the government agreed to reimburse TOPtainer for the lost containers upon proper invoicing. Therefore, pursuant to the express terms of the Master Lease, title transferred to the government, and the taking, if one occurred, occurred when the government declared plaintiffs' containers lost.

Plaintiffs argue that the Master Lease should not be controlling because they were not parties to that lease and therefore should not be bound by those terms. The court disagrees. The undisputed facts demonstrate that the Master Lease pre-dates plaintiffs' leases, and that plaintiffs chose to enter into their contracts after the Master Lease was executed. As this court has previously held, after an examination of the Master Lease and plaintiffs' contracts with TOPtainer, "plaintiffs, knowing their containers were in use by the government, agreed to accept payment from TOPtainer, and TOPtainer alone, if the government lost the plaintiffs' containers." Textainer, 99 Fed. Cl. at 219. Plaintiffs

were aware, or should have been aware, of the terms of the Master Lease vis-à-vis their own contracts with TOPtainer.[13]

In sum, title transferred and a taking may have occurred when plaintiffs' containers were "deemed lost" by the government under the terms of the Master Lease. To determine whether a compensable taking occurred, the court now turns to the facts of CAI's case, and the arguments regarding whether the government received sufficient notice from plaintiffs such that it could not be a "buyer in the ordinary course," but instead took title to the containers in its sovereign capacity, outside the terms of the Master Lease.

### c. Capital's notice of TOPtainer's default was not sufficient to put the government on notice as to all plaintiffs, and CAI's notice to the government occurred after title had transferred.

For plaintiff CAI, the government argues that it was a "buyer in the ordinary course" of CAI's containers, and thus did not "take" CAI's containers in its sovereign capacity. In particular, the government contends that because it did not receive notice from CAI of TOPtainer's default before it took title to the containers under the Master Lease, the government acquired plaintiffs' containers in its proprietary capacity, and no taking has occurred. Plaintiffs argue that the government cannot be "a buyer in the ordinary course" under the UCC for CAI's containers because the government received notice from Capital of TOPtainer's default under Capital's lease in August 2004, well

---

[13] Moreover, unlike the plaintiffs' liens in Armstrong for which the Supreme Court found a taking had occurred, plaintiffs' contracts with TOPtainer in this case were "affected by the contractual arrangements" between TOPtainer and the United States executed before plaintiffs entered into their own contracts with TOPtainer. 364 U.S. at 45-46.

-24-

before the government took title. Plaintiffs also argue that CAI notified the government of CAI's rights to its containers before the government executed the contract modification authorizing the buyout of CAI's containers, and before the government paid TOPtainer for those containers. In such circumstances, plaintiffs argue, the government could have paid the rightful owner of the containers.

As noted above, the court holds that the relevant date for the takings analysis occurred when title passed to the government—when, under the Master Lease, it declared plaintiffs' containers lost. While the government pegs the date of the taking in this case on January 14, 2005, when the government stopped paying per diem rental charges to TOPtainer for the lost containers, the undisputed facts show that even before that date, the government had determined the containers were lost. Under the terms of the Master Lease, the government could declare plaintiffs' containers lost and take title to those containers ninety days after the expiration of the Master Lease, and, in return, would pay TOPtainer for the lost containers that were properly invoiced. TOPtainer submitted its invoices for all of CAI's containers on December 29, 2004, showing that these containers were identified as "lost" before that date. In any event, the undisputed facts show that at the very least, the government had declared CAI's containers lost before it received notice from CAI on February 8, 2005. On that same date, CAI received notice from the government that title had transferred sometime before that date. Government contractor Len Priber's email to CAI on February 8, 2005, states that "we have notified Toptainer of all units declared lost." Pls.' First Mot., Ex. 18.

-25-

Thus, CAI's notice to the government occurred after title had passed. This notice also occurred after TOPtainer had invoiced the government for CAI's lost containers pursuant to the Master Lease on December 29, 2004. Therefore, the government was not put on notice by CAI, before title had passed, of TOPtainer's default under its lease with CAI. Under the UCC, good title will pass if the buyer—here, the government—is "without knowledge that the sale violates the rights of another person in the goods." UCC § 1-201(9). Furthermore, under UCC § 2-403, CAI assumed the risk that TOPtainer might sell its containers. See DeWeldon, Ltd. v. McKean, 125 F.3d 24, 28 (1st Cir. 1997) ("When a person knowingly delivers his property into the possession of a merchant dealing in goods of that kind, that person assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser."). This concept extends to the lease contracts for the case at hand under UCC § 2A-305(2). Under that section, a "buyer in the ordinary course" will take free and clear of any existing lease contract—here, the lease contract between CAI and TOPtainer.

The court is not persuaded by plaintiffs' argument that a taking occurred after title had passed because the government did not authorize the buyout until February 17, 2005 and did not pay TOPtainer until March 21, 2005, and that, therefore, the government could have stopped the buyout after it had received notice from CAI. As discussed above, title already passed to the government once the government declared plaintiffs' containers lost. Once TOPtainer had properly invoiced the government for CAI's containers, the government was obliged to pay TOPtainer under the terms of the Master Lease. Therefore, the court finds that the government was acting in its proprietary

-26-

capacity when it authorized the contract modification and paid TOPtainer, instead of CAI, for CAI's containers.

Nor is the court persuaded by plaintiffs' argument that Capital's notice to the government in August 2004 served as constructive notice to the government for plaintiff CAI, and that, therefore, the government cannot claim valid title under the terms of the Master Lease.[14]  Specifically, plaintiffs argue that to be a "buyer in the ordinary course," the government was required to act in "good faith," which meant that the government had to observe "reasonable commercial standards" under the UCC.  Pls.' Reply at 22-23 (citing Touch of Class Leasing v. Mercedes Benz Credit, 591 A.2d 661, 671 (N.J. Super. Ct. App. Div. 1991)).  Plaintiffs further contend that observance of "reasonable commercial standards" mandated that the government conduct a reasonable inquiry into the ownership status of all other container owners that leased their containers with TOPtainer once the government became aware that TOPtainer was in default with Capital.  The government argues in response that it had no such duty to inquire into the status of TOPtainer's rights over CAI's containers based on Capital's notice to the government.  The government contends that nothing in the UCC or in the cases interpreting the UCC suggests that the government had a duty to inquire into TOPtainer's

_____

[14] Plaintiffs also generally argue that that because TOPtainer did not own any of the containers that it was leasing to the government, any provision in the Master Lease involving title transfer is void.  Plaintiffs provide no authority for this statement.  In addition, as discussed above, this court has previously held after an examination of the relevant contracts that "plaintiffs, knowing their containers were in use by the government, agreed to accept payment from TOPtainer, and TOPtainer alone, if the government lost the plaintiffs' containers."  Textainer, 99 Fed. Cl. at 219.  Plaintiffs were aware, or should have been aware, of the terms of the Master Lease vis-à-vis their own contracts with TOPtainer, and plaintiffs' contracts did not operate to void any provision of the Master Lease with TOPtainer.

relationship with its other contractors because the government learned TOPtainer was in default with one.

After consideration of these arguments, the court finds that Capital's notice to the government of TOPtainer's default under its own lease with TOPtainer was not enough to put the government on notice as to the other plaintiffs' containers. If the United States had a duty to inquire into the rights TOPtainer had in the leased containers once it learned of TOPtainer's default under its lease with Capital, the court finds that that duty was limited to an inquiry into the status of TOPtainer's rights in Capital's containers only. To hold otherwise would put an unreasonable burden on the government to inquire into the status of a prime contractor's relationship with all of its subcontractors, based on notice of default from one. The burden should be on each subcontractor to provide the government with notice.[15]

Moreover, under the unique facts of this case, the court does not find it commercially unreasonable that the government would conclude that TOPtainer's default with Capital was limited only to Capital. The undisputed facts show that CAI is seeking compensation for only 387 out of the 435 containers declared lost by the government because CAI was in fact paid by TOPtainer for some of the containers declared lost by the government. In other words, TOPtainer continued to pay CAI after title had transferred to the government in accordance with both the Master Lease and CAI's contract with TOPtainer.

---

[15] This holding is consistent with UCC §§ 2-403 and 2A-305, which place the risk of loss onto the party that entrusts its property to a merchant—here, the plaintiffs—rather than onto a "buyer in the ordinary course" of that property.

-28-

In addition, although CAI asserts that TOPtainer had fallen significantly behind in its per diem payments to CAI as early as 2004, CAI never alerted the government of TOPtainer's default until February 8, 2005. CAI could have provided timely notice, but for its own reasons elected not to. Accordingly, the court finds that the notice the government received from Capital in August 2004 did not serve to put the government on notice that TOPtainer was in default with CAI. For all of these reasons, the court holds that the government, as a "buyer in the ordinary course," took valid title to CAI's containers under the terms of the Master Lease in its proprietary, rather than sovereign capacity. The government is therefore entitled to summary judgment as to plaintiff CAI's takings claim.

C.      **The government is entitled to summary judgment as to plaintiff Cronos's claim.**

Plaintiff Cronos also seeks just compensation for 103 of its containers that were subject to the TOPtainer buyout. Before moving onto the merits of Cronos's takings claim, the court must also establish that it has jurisdiction to consider Cronos's claims. The government does not dispute that Cronos owns 72 of the 103 containers for which it is seeking compensation. However, the government does dispute whether Cronos may assert a claim for 31 containers that it did not own, but managed for "external investors." Cronos argues that these containers were "retired" and Cronos paid the external investors for their property interest in the containers. Cronos argues that in such circumstances it is properly the successor to the claims of the external investors with regard to the 31 containers.

The court agrees with the government that Cronos may not pursue compensation for these 31 containers. Cronos has produced no evidence as to the identity of these investors or Cronos's purchase of the 31 containers from the external investors. The court finds that as a matter of law Cronos has not established a valid property interest in the 31 containers. See Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (holding that only persons with a valid property interest at the time of the taking are entitled to compensation). The court therefore holds that the government is entitled to summary judgment as to these 31 containers.

The court also concludes that the government is entitled to summary judgment for the remaining 72 Cronos containers at issue in this case. It is undisputed that Cronos never notified the government of TOPtainer's default under its lease with Cronos. As a result, the government was at all times a "buyer in the ordinary course" of Cronos's containers. Therefore, for the reasons discussed above with regard to CAI's takings claim, the court finds that the government is entitled to summary judgment as to plaintiff Cronos's 103 containers.

## III. CONCLUSION

For the foregoing reasons, the court holds as follows:

1. Plaintiffs' motion to join Green Eagle as the real party in interest is **GRANTED**. The parties shall have until **January 31, 2013** to conduct limited discovery into whether Green Eagle has standing to pursue this takings claim and whether Capital's takings claim transferred to Green Eagle by operation of law or is barred by the Anti-Assignment Act. The court **STAYS** ruling on the parties' cross-motions in regard to the government's liability as to Green Eagle, and on

plaintiffs' motion for sanctions,[16] until after discovery is complete. Upon completion of discovery, the parties shall submit a status report by **February 8, 2013**, outlining next steps in this litigation.

2. Plaintiffs' motion for summary judgment as to plaintiffs CAI and Cronos is **DENIED**. The government's cross-motion for summary judgment as to plaintiffs CAI and Cronos is **GRANTED**.

3. The court **STAYS** ruling on the proper interest rate to apply pending resolution of Green Eagle's claim.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[16] The court will consider plaintiffs' motion for sanctions only as it relates to Capital's containers.